**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Wilson-Davis & Co., Inc., | ) | CASE NO. 1:16 CV 3056 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| James Mirgliotta, et al, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

Plaintiff Wilson-Davis & Co., Inc. filed this action seeking a declaratory judgment that it is not required to arbitrate claims that Defendants James Mirgliotta and James Mirgliotta, as administrator of the Estate of Bette Mirgliotta, filed against it in an arbitration proceeding before the Financial Industry Regulatory Authority ("FINRA"). Plaintiff's Motion for Preliminary Injunction (Doc. 11) is currently pending before the Court. At the case management conference on March 20, 2017, the parties agreed that "the trial will be advanced and consolidated with the preliminary injunction hearing and will be decided on briefs unless otherwise notified." (Doc. 42). For the reasons that follow, the Court finds that the Mirgliottas' claims against Wilson-Davis regarding their investment losses in the stock of VgTel Inc. ("VGTL") and New Market Enterprises are subject to FINRA arbitration, but their claim against Wilson-Davis regarding

their losses in the stock of Q Lotus is not.

**FACTS**

Wilson-Davis, a national securities clearing firm that operates an equity trade execution desk, is a member of FINRA. On August 22, 2016, the Mirgliottas commenced FINRA proceedings against various broker-dealers, including Wilson-Davis, in addition to individual defendants, resulting from the Mirgliottas' loss of over $700,000 in investments.[1]

During the relevant time period, Larry Werbel was the Mirgliottas' financial advisor. On July 12 and 19, 2013, respectively, Werbel opened IRA accounts for Jim and Bette Mirgliotta at Wilson-Davis by transferring money from their IRA accounts at TD Ameritrade.[2] See Statement of Claim at ¶¶23-25, 49-52. At the time, Werbel was working for Summit Brokerage Services, Inc. (First Am. St. of Claim ¶¶ 23, 50). Werbel discussed opening the accounts at Wilson-Davis with Mr. Mirgliotta and had Mr. Mirgliotta's authority to open them. (Jim Mirgliotta Dep., at 11-14). Mr. Mirgliotta testified that he received monthly statements for the accounts and that he was not surprised to receive documents from Wilson-Davis because Werbel had informed him that his 401(k) money was being moved to Wilson-Davis. (Jim Mirgliotta Dep., at 23, 66).

The Mirgliottas allege, however, that Christopher Cervino, the Mirgliottas' account executive and registered representative at Wilson-Davis, opened the new IRA accounts using

---

[1] Bette Mirgliotta is deceased. The Mirgliottas filed a First Amended Statement of Claim on November 11, 2016, to properly identify the Estate of Bette Mirgliotta as a claimant.

[2] According to the First Amended Statement of claim, in December of 2012, Jim Mirgliotta's TD Ameritrade account had a balance of $202,816.90. When Bette's account was opened at Wilson-Davis, $496,075.12 was transferred into the account from the TD Ameritrade account.

fraudulent signatures. (First Am. St. of Claim ¶¶ 24-25, 51-52). Mr. Mirgliotta testified that he did not sign the account opening documents submitted to Wilson-Davis, that his signature on the documents was forged, and that Werbel did not have the authority to create or sign the new account documents and submit them to Wilson-Davis. (Jim Mirgliotta Dep., at 27-28). Similarly, Mr. Mirgliotta testified that he did not sign the forms authorizing the transfer of securities from the TD Ameritrade account to Wilson-Davis, that his signature on those documents was forged, and that he did not authorize Werbel to create and submit the documents to Wilson-Davis. (*Id.* at 30-31).

Lyle Davis, Chairman of the Board and Treasurer at Wilson-Davis, testified that the Mirgliottas' accounts were opened using the company's normal procedures for opening a new customer account. (Davis Dep. at 13). Davis testified that both Cervino, as the registered representative, and Davis, as an authorized officer, reviewed the Mirgliottas' New Account Applications and Principal IRA Applications. (*Id.* at 28–29, 41). Wilson-Davis issued account numbers for the Mirgliottas' respective accounts, allowing the transfer of their funds from the TD Ameritrade accounts.

From July 12th to July 18th, 2013, Cervino bought and sold a penny stock in VGTL using the funds in Mr. Mirgliotta's Wilson-Davis account. Wilson-Davis earned over $5,000 in commissions for the purchases and sales of securities in Mr. Mirgliotta's account. Other than the opening and the closing of the account in Mrs. Mirgliotta's name, there were no transactions in her account, including for the sales or purchase of securities.

On July 19, 2013, Mr. Mirgliotta received an email from an individual named Efran

3

Eisenberg[3] containing instructions regarding wiring money out of the Mirgliottas' accounts at Wilson-Davis. The email states that Wilson-Davis would be wiring a total of $565,000 out of the Mirgliottas' accounts ($75,000 from Jim's account and $490,000 from Bette's) to the Mirgliottas' joint account at Liberty Bank. The money was then to be transferred to New Market Enterprises. (Jim Mirgliotta Dep., Ex. 13). Around this time, Mr. Mirgliotta remembers having a conversation with Cervino or Werbel–he cannot recall which–regarding transferring money out of his Wilson-Davis account into his bank account, and eventually to New Market Enterprises. (Jim Mirgliotta Dep., at 33-34) ("A: I was instructed to [write a check to New Market Enterprises]. Q: By Mr. Werbel? A: I'm not sure if it was Mr. Werbel or Mr. Cervino at this time, I'm really not."). Nevertheless, he testified that he believed Cervino, along with Werbel and Durante, was responsible for instructing him to do so:

> Q: But [Cervino] doesn't appear on any of the documents when they're sent off, it looks like it's Mr. Durante, and Efran Eisenberg, and Larry Werbel, and you.
> ***
> A: I feel Mr. Cervino had something to do with this, because he's part of that whole group....It's a fact. Mr. Cervino is part of this group that moved my money out of Bette and our account into their pocket, that's how I feel.
> ***
> Q: I'm going to ask you to tell me everything you can remember that Mr. Cervino told you on the telephone.
> A: I don't recall, that was four years ago, other than the instructions were clear that I was getting a phone call from Mr. Cervino, okay, about the money transfer, and the instructions were then to send it to New Market Enterprises. That's all I can tell you.
> Q: Who told you that you were getting the phone call? Was that Mr. Werbel?

---

[3] On January 6, 2016, Larry Werbel, Chris Cervino, and Edward Durante (who went by a number of aliases, including Efran Eisenberg and Ted Wise) were indicted for involvement in a scheme to defraud investors. They executed the scheme through false and misleading representations about how the investors' monies would be used, omissions in connection with the sale of VGTL securities, and manipulation of the public market in VGTL's stock. (Defs.' Br. in Opp., Ex. E).

4

     A: Mr. Werbel.
     Q: And Mr. Werbel told you the instructions were to send it? I mean, we have paperwork.
     A: I don't recall.
     Q: You don't remember.
     A: No.
     Q: And on the basis of no recollection, you believe that Mr. Cervino and Wilson-Davis caused you, personally, to send money to New Market Enterprises?
     A: Yes.

(*Id.* at 70-71, 74).

On July 22, 2013, $75,000.00 was wired out of Mr. Mirgliotta's Wilson-Davis account to his account at Liberty Bank. Similarly, on July 19, 2013, a wire funds request form was completed requesting a wire transfer out of Bette Mirgliotta's account in the amount of $490,000.00 to the account at Liberty Bank. The wire funds requests were approved by Wilson-Davis Chief Operating Officer, Bill Walker, and Wilson-Davis charged and received a fee for the outgoing wires. Mr. Mirgliotta himself signed the form to transfer the funds from his and his wife's joint bank account to New Market Enterprises. (Jim Mirgliotta Dep., at 63).

At his deposition, Mr. Mirgliotta was asked if he was willing to accept all the transactions contained on the Wilson-Davis monthly statements. He testified that he was because he believed Werbel and Cervino were acting as his agents with respect to the transactions:

     Q: So, were you prepared to accept these transactions because Mr. Werbel had done them?
                                 ***
     A: Yes.
     Q: And so he was your agent for purposes of these transactions?
                                 ***
     A: Along with Mr. Cervino from Wilson-Davis.
     Q: Well, tell me how you think Mr. Cervino was your agent.
     A: Well, he's the agent of record with the Wilson-Davis Company, who I thought was all part of this....transaction.
     Q: Tell me what you mean, it was all part of this transaction.
     A: What can I tell you that I haven't already told you? Money went from TD

5

> Ameritrade, to Wilson-Davis, to Liberty Bank, to New Market Enterprises, all per the instructions of Mr. Werbel, Mr. Durante, Mr. Cervino.

(Jim Mirgliotta Dep., April 12, 2017, at 68-69).

At some point in August 2013, Chris Cervino left Wilson-Davis. The Mirgliottas' accounts at Wilson-Davis were closed on or about September 3, 2013, and any remaining funds were transferred out of the accounts. Wilson-Davis has not refunded any of the fees that it received from the Mirgliottas.

In their First Amended Statement of Claim in the FINRA proceedings, the Mirgliottas claim that they ultimately lost $67,141.36 in investments in VGTL, $20,978.00 in investments in a company called Q Lotus,[4] and $690,000.00 in New Market Enterprises. The Mirgliottas allege that Wilson-Davis (along with other broker respondents) was "negligent in [its] failure to adhere to the opening, administering, and supervising of the Mirgliottas' accounts and other indirect accounts with the promotion of penny stocks to [its] investors." They also claim that Wilson-Davis is vicariously liable for its financial advisors' misconduct and that it negligently failed to monitor the Mirgliottas' accounts or activity in those accounts, failed to monitor the purchase of penny stocks in the accounts, and failed to properly train and supervise its advisors. (First Am. St. of Claim ¶¶ 78, 87-97).

Wilson-Davis filed a two-count complaint with this Court on December 21, 2016, seeking (1) a declaratory judgment that Wilson-Davis has no obligation to arbitrate the Mirgliottas' claims because the Mirgliottas were not its "customers," and (2) a preliminary and permanent injunction enjoining the Mirgliottas from further proceedings against Wilson-Davis in

---

[4] The Mirgliottas allege that this money was lost on June 7, 2013, before their accounts at Wilson-Davis were opened. (First Am. St. of Claim ¶ 22).

the arbitration. As noted, the parties have agreed that the trial will be advanced and consolidated with the preliminary injunction hearing and will be decided on briefs.

## **STANDARD**

In general, the standard for granting a permanent injunction is "essentially the same" as that for a preliminary injunction, except that a plaintiff must demonstrate actual success on the merits rather than likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted," and that it is in the public's interest to issue the injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837, 1839 (2006).

## **LAW AND ANALYSIS**

The only issue in dispute is whether the Mirgliottas' claims against Wilson-Davis are subject to arbitration in the FINRA proceeding. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT&T Techs. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S. Ct. 1415 (1986). FINRA's arbitration rules are to be interpreted like contract terms; thus, the rules must be "interpreted to give effect to the parties' intent as expressed by the plain language of the provision" at issue. *Citigroup Global Mkts. Inc. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014) (quotations omitted).

Under the FINRA Code, members must submit to FINRA arbitration of a dispute if:

- Arbitration...is either:
    (1) Required by a written agreement, or

7

> (2) Requested by the customer;
> • The dispute is between a customer and a member or associated person of a member; and
> • The dispute arises in connection with the business activities of the member or the associated person....

FINRA Rule 12200. Here, there is no written agreement requiring arbitration. Thus, the Mirgliottas must have been Wilson-Davis's customers in order to trigger the FINRA arbitration requirement. In addition, the dispute must arise in connection with the activities of the member or in connection with the business activities of the associated person. *Vestax Secs. Corp. v. McWood*, 280 F.3d 1078, 1081 (6th Cir. 2002). Both conditions are satisfied here with respect to the Mirgliottas' claims regarding their losses in VGTL stock and New Market Enterprises.

Other than stating that a "customer shall not include a broker or dealer," the FINRA Code does not define the term "customer." Because Wilson-Davis disputes that it has an obligation to arbitrate, the general presumption in favor of arbitration does not apply and the word "'customer' must be construed in a manner consistent with the reasonable expectations of FINRA members." *Abbar*, 761 F.3d at 274-75 (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011)). Both parties cite to the Second Circuit's definition of "customer" in *Abbar*. There, the court defined the term to mean "one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member." *Id.* at 275. Both Jim and Bette Mirgliotta had accounts with Wilson-Davis; thus, they were its "customers." As the court in *Abbar* explained, "[a]n account holder has a reasonable expectation to be treated as a customer, whether or not goods or services are purchased directly from the FINRA member. Likewise, the FINRA member should anticipate that account-holders may avail themselves of the arbitration

8

forum to dispute transactions arising from the account." *Id.*; *see also Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995) (holding that "placing funds with Oppenheimer for investment" created a "customer" relationship under the predecessor rule to FINRA Rule 12200).

Wilson-Davis argues that Werbel, rather than the Mirgliottas, was Wilson-Davis's customer because the Mirgliottas claim that he and Cervino fraudulently opened the accounts using forged signatures. Wilson-Davis cannot avoid arbitration by relying on its employee's fraud. *See Oppenheimer*, 56 F.3d at 357 (finding customer relationship with FINRA member, despite the claimant's lack of an account with the member, because the claimant would have had an account with the member but for the alleged fraud of the member's representative). Wilson-Davis does not dispute that the Mirgliottas had accounts in their names at Wilson-Davis or that they were aware of these accounts. Nor does it dispute that these accounts held their money–not Werbel's–or that Wilson-Davis charged the Mirgliottas–not Werbel–for fees associated with transactions in the accounts. As such, the Mirgliottas had a reasonable expectation that they would be treated as customers and that they could avail themselves of the arbitration forum to dispute issues arising from the accounts.[5]

The dispute regarding VGTL and New Market Enterprises also arises in connection with

---

[5] In addition, the Sixth Circuit has held that persons who conduct business with a FINRA member's registered representative become customers of the FINRA member, even where they do not establish an account with the member. *WMA Secs. Inc. v. Wyn*, 32 Fed. Appx. 726, 729 (6th Cir. 2002) (citing *Vestax Secs. Corp. v. McWood*, 280 F.3d 1078 (6th Cir. 2002)). Mr. Mirgliotta testified that the Mirgliottas' money "went from TD Ameritrade, to Wilson-Davis, to Liberty Bank, to New Market Enterprises, all per the instructions of Mr. Werbel, Mr. Durante, [and] Mr. Cervino." By conducting business with Cervino, a registered representative of Wilson-Davis, the Mirgliottas became customers of Wilson-Davis.

9

Wilson-Davis's business activities or the business activities of its associated persons. Wilson-Davis asserts that, at most, only the $67,141.36 in VGTL investments relates to activity that occurred while the Mirgliottas were Wilson-Davis customers. It notes that the Mirgliottas did not make any investments in Q Lotus while their accounts were at Wilson-Davis, that no transactions occurred in Mrs. Mirgliotta's account while it was at Wilson-Davis, and that the monies sent to New Market Enterprises were sent from the Mirgliottas' personal bank accounts rather than Wilson-Davis. With the exception of Q Lotus, Wilson-Davis's argument is not well-taken.

In their First Amended Statement of Claim, the Mirgliottas allege, in part, that Wilson-Davis negligently "fail[ed] to adhere to the opening, administering, and supervising of the Mirgliottas' accounts," negligently failed to monitor the Mirgliottas' accounts or activity in those accounts, and failed to properly train and supervise its advisors. The Sixth Circuit has held that "[a] dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business." *Vestax*, 280 F.3d at 1082 (quotations omitted) (noting that the investors intended to prove in arbitration that Vestax's failure to properly supervise its registered representatives led to the loss in question). The Mirgliottas' claims regarding VGTL and New Market Enterprise arise from Wilson-Davis's alleged lack of supervision over Cervino. Indeed, Wilson-Davis does not dispute that the loss in the VGTL investments relates to activity that occurred while the Mirgliottas' money was held in Wilson-Davis accounts. With respect to New Market Enterprises, Wilson-Davis may be correct that the Mirgliottas' money did not go directly from Wilson-Davis to New Market. Nevertheless, Mr. Mirgliotta testified that he believed that Cervino and Wilson-Davis caused him to send the money there. Thus, the Mirgliottas' dispute

regarding these losses arises in connection with the business activities of Wilson-Davis and its associated persons. Whether, in fact, the Mirgliottas are able to establish that their losses resulted from Wilson-Davis's lack of supervision is a matter for the arbitration panel to determine.

Because the dispute regarding VGTL and New Market Enterprises is subject to arbitration, Wilson-Davis has not demonstrated that requiring it to arbitrate these claims will cause irreparable injury. Considering the balance of hardships between Wilson-Davis and the Mirgliottas, Wilson-Davis cannot show that it is entitled to a remedy in equity or that an injunction regarding these claims would be in the public's interest.

With respect to Q Lotus, however, the Mirgliottas' losses occurred before they became customers of Wilson-Davis. Thus, their dispute regarding this loss did not arise in connection with Wilson-Davis's business activities. Wilson-Davis, therefore, cannot be forced to arbitrate any dispute regarding this loss.

**CONCLUSION**

For the foregoing reasons, the Court finds that the Mirgliottas' claims against Wilson-Davis regarding their investment losses in the stock of VGTL and New Market Enterprises are subject to FINRA arbitration. The parties shall proceed to arbitration on these claims, conducted in accordance with applicable FINRA rules. The Mirgliottas' claim against Wilson-Davis regarding their losses in the stock of Q Lotus, however, is not subject to arbitration, and arbitration regarding this claim is hereby permanently enjoined.

IT IS SO ORDERED.

                                              /s/ Patricia A. Gaughan
                                              PATRICIA A. GAUGHAN
Dated: 4/28/17                      United States District Judge